UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARCELLOUS L. WALKER,

    Plaintiff,

v.                                                   Case No. 22-C-858

JACOB CIRIAN,

    Defendant.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Marcellous Walker, an inmate at the Wisconsin Secure Program Facility, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on First Amendment claims based on allegations that Defendant Jacob Cirian confiscated Walker's manuscript after rejecting his request for permission to publish and that he prohibited Walker from sending an email that contained personal information about a former staff member. On May 16, 2023, Walker moved for summary judgment. Dkt. No. 58. Cirian moved for summary judgment shortly thereafter, on May 26, 2023. Dkt. No. 67. A few weeks later, on June 19, 2023, Walker filed a motion to strike and a second amended motion for leave to file an amended complaint. Dkt. Nos. 83, 91. This decision resolves the parties' motions.

### PRELIMINARY MATTERS

On June 19, 2023, in response to Cirian's motion for summary judgment, Walker moved under Federal Rule of Civil Procedure 12(f)(2) to strike arguments Cirian raised in his legal brief. The Court will deny the motion because Rule 12(f) applies to pleadings, not motions, legal briefs, or other evidence. Also, any motion brought under Rule 12(f) must be filed within twenty-one

days of the party being served with the pleading. Even assuming Cirian raised his arguments in his answer (which he did not), the answer was served on Walker ten months ago, making his motion untimely. Finally, as Cirian highlights, the parties have fully briefed the issues Walker raises in his motion, and the Court prefers deciding issues on the merits. *See Foman v. Davis*, 371 U.S. 178, 782 (1962).

Also on June 19, 2023, Walker filed a second amended motion for leave to file an amended complaint. Just three days earlier, the Court had denied Walker's amended motion for leave to file an amended complaint "on the ground of undue delay because the facts upon which Walker base[d] his new proposed theories of liability were available to him when he filed his complaint and he offer[ed] no adequate reason for waiting until after discovery was closed and both parties had moved for summary judgment before filing his motion." Dkt. No. 82 at 2-3. The Court will deny Walker's second amended motion for the same reasons it denied his first amended motion. As already explained, allowing Walker to add new theories of liability months after discovery had closed and after both parties had moved for summary judgment would significantly delay resolution of this case. The Court need not tolerate such a delay. *See Cleveland v. Porca Co.*, 38 F.3d 289, 297-98 (7th Cir. 1994) (holding that the district court did not abuse its discretion in refusing to allow the plaintiffs to amend their complaint when they waited until after discovery had been completed and summary judgment motions had been fully briefed before filing their motion to amend); *see also Perrian v. O'Grady*, 958 F.2d 192, 195 (7th Cir. 1992) (stating that long delays before seeking to amend a complaint can burden the judicial system, can defeat the public's interest in a speedy resolution of legal disputes, and can justify a district court's denial of a motion to amend).

# BACKGROUND

## A. Walker's Manuscript Claim

At the relevant time, Walker was incarcerated at the Wisconsin Secure Program Facility, where Cirian worked as the Corrections Unit Supervisor. Between October 2016 and November 2020, Walker and another inmate collaborated on writing a fictional book series loosely based on their life experiences. The manuscript at issue, entitled "2011: The Young Street Punk," follows an African American teenager, "Toon," who at the age of fifteen is kicked out of his mother's house because he refuses to follow the rules. While living with friends, he engages in near-constant criminal activity, including robberies, car jackings, selling drugs, and violent assaults. He also has many consensual sexual encounters with different young women, most of whom are his age or just slightly older. Walker explains that "[t]he story details the character's experience with the juvenile justice system, heartbreak, high school popularity, street notoriety, and his reckless promiscuity." He also notes that the manuscript is intended for "mature readers, was intended for public consumption, and is nearly 300 pages in length." Dkt. No. 80 at ¶¶3-4, 7-17; Dkt. No. 69 at ¶¶3, 10. The actual manuscript appears in the docket as Exhibit 1005 and is sealed at Dkt. No. 28-1.

In late 2020, Walker had a complete handwritten version of the manuscript and a partially typed version of the manuscript in his cell. Walker's toilet overflowed, contaminating the handwritten version and part of the typed version. Due to cost considerations, Walker decided not to re-type the manuscript on his personal typewriter. Instead, using his tablet, Walker sent the manuscript to Attorney Michael Lueder in a series of emails. Lueder printed and mailed the emailed manuscript to Walker; each page of the manuscript bears Lueder's email account header. Walker disposed of the contaminated copies. Dkt. No. 69 at ¶¶15-22, 27; Dkt. No. 80 at ¶20, 25-29.

Hoping to someday publish the manuscript, Walker submitted it to Cirian for review pursuant to the manuscript review policy. Walker was only generally aware that a policy existed; he never looked at the policy while he was drafting his manuscript to learn what topics are not permissible under the policy. Cirian contacted the previous security director for information about the review process. The security director gave Cirian DAI Policy 309.00.52 – Writing and Seeking Publication of Written Works, which states, in part, that inmate manuscripts shall not:

> Teach or describe the manufacture or use of weapons, explosives, or other devices that create a substantial danger of physical harm to self or others.
> 
> Teach or describe the use of drugs or intoxicating substances.
> 
> Constitute pornography under Wisconsin Administrative Code s. DOC 309.02(16) and DAI Policy 309.00.50.

DAI Policy 309.00.52(IV)(B)(2)-(3), (10); Dkt. No. 69 at ¶¶12-14, 18, 32-33; Dkt. No. 80 at ¶50.

Cirian explains that the provisions prohibiting the teaching or description of the manufacture or use of weapons and drugs are in place "to prevent the knowledge of how to create or use weapons or drugs," to avoid leading others to engage in criminal behavior. Cirian asserts that it is also in place to assist in the rehabilitative process of the inmate. Because the use or creation of weapons or drugs may be the cause of their incarceration, allowing the disclosure of that same practice in written materials could negate the rehabilitative goal of the institution and could reflect negatively on the rehabilitative effects on the inmate. Cirian also explains that pornography is not allowed in institutions "in order to promote safety within the institution and a rehabilitative environment [], as well as reduce sexually driven crime and recidivism." Pornography is defined as any written material which the average person, applying state contemporary community standards, would find, when taken as a whole, appeals to the prurient interest, describes human sexual behavior in a patently offensive way, and lacks serious literary,

4

artistic, political, educational, or scientific value. Dkt. No. 69 at ¶¶42-43, 48-49; Dkt. No. 80 at ¶62.

Also, DAI Policy 309.00.52(I)(D) notes that "[m]anuscripts shall not be created on any DOC owned computer but shall be handwritten or typed on the inmate's personally owned typewriter." Finally, the policy warns that if the facility coordinator determines a manuscript is not allowed to be sent out for publication, the manuscript will be retained; the inmate is permitted to appeal the decision through the inmate complaint review system. The policy instructs staff to confiscate a manuscript if it violates the policy, noting that the inmate may be subject to discipline. Dkt. No. 69 at ¶¶55, 66-69; Dkt. No. 80 at ¶47.

Upon review, Cirian determined that Walker's manuscript repeatedly violated policies. Cirian noted that the use of drugs and weapons was depicted throughout the manuscript. He also noted that several portions of the manuscript detailed explicit sexual interactions between individuals, some of whom, including the main character, were minors under the age of consent. Cirian concluded that these explicit sexual scenes involving minors constituted pornography and therefore violated that aspect of the policy. Cirian also found that Walker had violated the policy because he submitted a series of printed emails rather than a manuscript that was handwritten or typed on his personal typewriter as the policy requires. Cirian also suspected that Walker and his co-author had secretly passed the manuscript back and forth rather than using the mail system as the policy requires. Dkt. No. 69 at ¶¶39-40, 44-46, 50, 54-55, 63.

Because Cirian rejected Walker's request that he be allowed to pursue publication, Cirian confiscated the manuscript as required by the policy. Cirian explains that confiscation is a safeguard to prevent inmates from ignoring the rejection and pursuing publication anyway. Cirian informed Walker that his manuscript violated DAI Policy 309.00.52 and would be retained so he could appeal the decision through the inmate complaint review system. Walker asked Cirian for

5

a section-by-section breakdown of the offending portions so he could edit the document. Cirian did not provide Walker with the requested breakdown. The policy does not require such a breakdown, nor does it provide the opportunity for inmates to edit their manuscripts. Dkt. No. 69 at ¶¶65-73; Dkt. No. 80 at ¶76.

Cirian explains that, because of the policy violations the manuscript contained, it was considered contraband and therefore could not be returned to Walker. Per DAI Policy 306.00.16, contraband is "any item which is not authorized by the institution. Inmates are not permitted to keep items determined to be contraband." Walker does not have another copy of the manuscript, and he has since abandoned the manuscript writing project with his co-author. Dkt. No. 69 at ¶¶77-82.

B. Walker's Email Claim

On March 14, 2022, Walker attempted to email several people outside the institution about rumors he had heard involving the sexual harassment of institution staff. The email contained personal information about a former employee, including her full name and details about where she may live. Walker suggested that the email recipients may want to talk to her about her experience, noting that they "might be able to get her to volunteer time for nonprofit work." He stated, "Get on google. See what you can find. Let me know." Dkt. No. 69 at ¶¶83-88; Dkt. No. 80 at ¶¶77-82.

Emails are inspected by staff prior to being sent. Walker's email was flagged and sent to Cirian for review for a potential security concern. Cirian prohibited the email from being delivered because under DAI Policy 309.04.01(V)(F)(2), mail may not contain personal information about Department of Corrections staff. Cirian explains that this provision is in place to protect the safety and security of current and former employees. Further, to avoid issues such as fraternization, intimidation, or direct contact, personal information of current or former employees cannot be

6

disclosed to inmates. Cirian did not know Walker's intention in locating the former employee, but he did not want to potentially expose her to danger or harassment. Dkt. No. 69 at ¶¶83-94.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### A. Manuscript Claim

The United States Constitution permits far greater restriction of prisoners' First Amendment rights than it allows on members of the general public. *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011). Prison regulations that impinge on an inmate's constitutional rights will be upheld "if they are reasonably related to legitimate penological interests." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). "Such legitimate penological interests might include

7

Case 1:22-cv-00858-WCG Filed 12/28/23 Page 7 of 14 Document 100

crime deterrence, prisoner rehabilitation, and protecting the safety of prison guards and inmates." *Id.* The Supreme Court has identified four factors that "courts may weigh in assessing the validity of a prison's regulations: (1) whether there is a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it'; (2) whether the inmates have access to 'alternative means' of exercising the restricted right; (3) the 'impact [an] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally'; and (4) whether the regulation is an 'exaggerated response to prison concerns.'" *Id.* (quoting *Turner*, 482 U.S. at 89-91). "Courts are to accord 'substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.'" *Id.* at 786 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

At the outset, it should be noted that Walker no longer seeks to have his manuscript published. In his deposition, Walker testified that he and his co-author had spoken about getting the manuscript published, but they "didn't have the funds available to get it published at that time, and the only thing [they] were preparing for at that moment was to get approval *so that if [they] did acquire the funds to get it published*, there [they] go." Dkt. No. 66 at 5 (emphasis added). Walker has presented no evidence suggesting that he or his co-author ever "acquire[d] the funds to get it published." Walker also testified at his deposition that, regarding seeking publication, he has "abandoned it entirely." *Id.* at 12. He also acknowledged that he and his co-author have not spoken in two years and that their friendship and collaboration have "dissolved." *Id.* Finally, one of the purported bases for Walker's claim is Cirian's refusal to allow Walker and his co-author to edit the manuscript to bring it into compliance with the policy, suggesting that Walker was open to revising the manuscript and was not insistent that Cirian approve the manuscript in its original

8

form. What he seeks in what remains of his lawsuit is the return of the manuscript to him for his own personal enjoyment, nominal damages of $1 and an award of punitive damages.

Walker notes that he submitted his only copy of the manuscript, and he argues that Cirian has no valid penological justification for refusing to give it back to him. Accordingly, the Court will focus its analysis only on whether Cirian's refusal to give the manuscript back to Walker was constitutionally permissible.

As an initial matter, the Court finds that no jury could reasonably conclude that Cirian violated Walker's First Amendment rights when he initially confiscated the manuscript. DAI Policy 309.00.52(VI) states that "[s]taff shall confiscate an inmate manuscript if it violates this policy and the inmate may be subject to discipline." Section (V)(C) states that "the manuscript shall be retained and inmate may appeal the decision through the [inmate complaint review system]." Thus, initial confiscation of an inmate manuscript allows the institution to accomplish two goals: First, it permits the institution to determine whether the manuscript violates *other* policies that might subject an inmate to discipline. And second, it facilitates the review by the institution complaint examiner. If a manuscript were immediately returned to an inmate, the institution complaint examiner would not be able to do an independent review to determine whether the facility coordinator properly applied the policy. Walker does not appear to challenge Cirian's initial confiscation of his manuscript. Instead, he asserts that Cirian violated his First Amendment rights when he refused to return the manuscript after it was clear that the manuscript did not violate any other policies and after the appeal process was complete.

Cirian explains that he refused to return Walker's manuscript for several reasons: 1) because Walker's manuscript was not approved for publication, it was contraband; 2) the institution has a legitimate interest in encouraging inmates to review and strictly abide by policies in the first place; and 3) the institution has an interest in preventing inmates from ignoring a

9

rejection and following through with the publication anyway. In addition, the question of whether prison authorities are justified in taking such action is an objective one: whether the action is rationally related to a legitimate goal. *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) (citing Turner, 482 U.S. at 91).

Implicit in the stated reasons is the conclusion that the manuscript includes writings that the institution is constitutionally entitled to restrict and prevent inmates from possessing in order to advance the general goals of encouraging prosocial and law-abiding behavior. In other words, the reasons for refusing to return the manuscript are the same as those offered for the finding that it did not meet the policy in the first place. Cirian explains:

> For example, to permit the writing of manuscripts that describe the use of drugs would defeat the larger goal of teaching prisoners that illicit drug use is illegal, with limited exceptions, and not entertainment. The institution is also trying to stem the proliferation of drug use within the facility itself and publications making the use of drugs just "part of the story" would defeat the institution's legitimate penological interests to keep drugs out of its walls.

Dkt. No. 68 at 12.

Cirian also argues that restricting such writings in the institution furthers its rehabilitative goals. Walker is serving a sentence for Second Degree Sexual Assault of a Child and Child Trafficking. Wis. Stat. §§ 948.02(1)(c), 948.051(1). As Cirian notes, "The possession of sexually explicit materials, particularly involving minors, does not advance the institution's interests in Walker's rehabilitation, specifically, due to the crimes for which he is incarcerated." *Id.* at 13; *see, e.g.*, *Bailey v. Stover*, 766 F. App'x 399, 401 (7th Cir. 2019) (explaining the institution's "policy of prohibiting sex offenders from possessing material with sexual content was reasonably related to the legitimate penological interest in rehabilitating these persons"). Add to these considerations, the racial slurs, the denigration of women, and the general vulgarity contained

therein, refusing to return the manuscript to Walker in order to further his rehabilitation and return to the community as a healthy, law-abiding person was justified.

The fact that Walker claims he intended to retain a copy of his manuscript does not change the result since it is his rehabilitation that is of concern, among other interests at stake. Moreover, as the court explained in *Van den Bosh*, "prison officials could have legitimate concerns that once such copies entered the prison system, such material might be 'expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct.'" 658 F.3d at 789 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 412-13 (1989) ("The problem is not . . . in the individual reading the materials in most cases. The problem is in the material getting into the prison."). In other words, to the extent Walker's manuscript is detrimental to his own rehabilitation, it may pose similar concerns to other inmates.

Walker also requested that Cirian provide for him a section-by-section breakdown describing which portions of his manuscript violated the DOC policy so that he could edit it accordingly. But to require Cirian or any other DOC official to read through and edit a 300-page manuscript, only to face challenges by the inmate over each edit, would consume the already overburdened resources of administrative staff. *See Thornburgh*, 490 U.S. at 418–19 (affirming district court's finding that "petitioners' fear that tearing out the rejected portions and admitting the rest of the publication would create more discontent than the current practice was 'reasonably founded'" and noting "the administrative inconvenience of this proposed alternative is also a factor to be considered and adds additional support to the District Court's conclusion that petitioners were not obligated to adopt it").

Cirian also contends that confiscation of Walker's manuscript was justified because he violated the policy provision requiring that manuscripts intended for publication be handwritten or typed on a personally owned typewriter. Dkt. No. 27-1 at 2. Cirian notes that this rule furthers

the goal of insuring such transcripts are administratively reviewed to insure compliance with the policy. As this case demonstrates, "allowing use of personal tablets and emailing makes it easier for inmates to avoid the publication review process set forth in the policy in that an inmate could simply email the manuscript and avoid [any] review whatsoever." Dkt. No. 68 at 14. Walker was apparently able to circumvent the rule by emailing his manuscript to an attorney because legal mail is not subject to close inspection. The fact that the manuscript may not have been reviewed in any event or that there may be other ways to circumvent the publication policy does not render Cirian's conclusion that Walker violated the policy invalid.

Cirian also concluded that Walker had improperly passed it to another inmate. While there is a dispute of fact as to whether Walker did improperly pass the manuscript to his co-author, the fact that Cirian reasonably concluded from the evidence before him that he did is sufficient to support his conclusion that Walker had violated this rule as well, further justifying confiscation of the manuscript. It is not the role of federal courts to provide de novo review of prison disciplinary proceedings.

Walker is certainly free to write and publish articles or manuscripts that are more conducive to living a law-abiding life. Moreover, once he completes his sentence, he is free to publish virtually any writing he chooses. But while subject to the rules of the prison, these rights are limited by the legitimate penological considerations set forth above. Given the deference that is required in this context to prison officials entrusted with the task of maintaining order and discipline in the overcrowded institutions of the State and furthering the rehabilitation of inmates, the court concludes that Cirian's decision did not violate Walker's First Amendment rights. His claim for return of his manuscript is therefore denied.

### B. Email Claim

Walker also asserts that Defendant violated the First Amendment when he refused to allow Walker to send an email that provided the name of a former correctional officer, identified the approximate area where she likely resided, suggested that the recipients contact her, and asked the recipients to let him know what they found out. Defendant explains that he did not allow the email to be sent because it contained personal information about a former staff member. He further explains that inmates are not allowed to send personal information about staff to people outside the institution in order to protect staff from unwanted contact, harassment, or intimidation.

Although prisoners have a constitutionally protected interest in sending correspondence, prison officials may impose restrictions on their correspondence if the restrictions are "reasonably related to legitimate penological interests. *Van den Bosch*, 658 F.3d at 785 (citations omitted). Protecting current and former staff members from unwanted and potentially dangerous contact at their homes is a valid penological interest. *See id*. It would be difficult for the Department of Corrections to hire and maintain staff if staff knew that inmates could inform their associates of who they are and how to locate them.

Walker asserts that he has concerns about misconduct within the institution, but he can communicate those concerns without identifying a particular staff member or instructing his associates to try and contact her. Certainly, if she desires to complain about the circumstances surrounding the termination of her employment, she can do that without Walker's assistance, involvement, or encouragement. And, obviously, allowing inmates to direct their associates to locate and contact current and former staff members could have a potentially significant impact on the safety and security of staff and their families. Although there may not be an obvious alternative for Walker to communicate his concerns about a particular staff member, the Court finds that preserving the safety, security, and peace of mind of staff is a sufficiently important governmental

13

interest to justify the limitation on Walker's rights in connection with his outgoing correspondence. Accordingly, Cirian is entitled to summary judgment on Walker's email claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Walker's motion for summary judgment (Dkt. No. 58), his motion to strike (Dkt. No. 83), and his second amended motion for leave to file an amended complaint (Dkt. No. 91) are **DENIED**.

**IT IS FURTHER ORDERED** that Cirian's motion for summary judgment (Dkt. No. 67) is **GRANTED** and this case is **DISMISSED**. The Clerk of Court shall enter judgment accordingly.

Dated at Green Bay, Wisconsin this 28th day of December, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.